**Peter J. PORCARO, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civ. A. No. 83–2707–MA.**

United States District Court, D. Massachusetts.

Aug. 18, 1986.

Peter J. Porcaro, pro se.

G.S. Katzmann, Asst. U.S. Atty., Boston, Mass., for respondent.

### MEMORANDUM AND ORDER

MAZZONE, District Judge.

This petition for habeas corpus relief from a conviction on seven counts of mail fraud is here on remand from the Court of Appeals for the First Circuit. This Court was directed to consider claims of ineffective assistance of counsel which, the Court ruled, should not have been summarily dismissed by the district court. Having reviewed carefully the voluminous record in this case—the trial transcript, pleadings on appeal and in particular the affidavits filed by the government—I am convinced that petitioner is not entitled to relief pursuant to 28 U.S.C. § 2255, and that no evidentiary hearing is required.

### I.

Peter J. Porcaro was convicted in 1982 of eight counts of mail fraud arising out of the sale by petitioner of distributorships, the value of which had been grossly exaggerated. The scheme involved two Massachusetts companies, Diversified Products, Inc. (Diversified) and National Marketing

Associates; petitioner was President of Diversified and his co-defendant, Francis Grenga, was National Director of Marketing. Advertisements in New England newspapers offered distributorships for sale, implying that Diversified was authorized by manufacturers of well-known name brand products including Scripto cigarette lighters, Timex watches and Duracell batteries to sell distributorships for them. A purchaser received inventory, display racks, and an exclusive list of supposedly carefully selected, high-traffic retail outlets. Diversified's sales pitch boasted distributors would earn handsome profits backed with a promise to buy back the distributorship and unsold inventory from any dissatisfied distributor after one year.

Customer complaints about damaged goods, bad locations and Diversified's refusal to honor its buy-back promise soon surfaced. An investigation by the Massachusetts Attorney General resulted in a preliminary injunction in November, 1976, enjoining Diversified and petitioner from using fraudulent advertising. The wording of the injunction was drafted during negotiations among the Commonwealth's attorney, petitioner, and petitioner's attorney. A second preliminary injunction against fraudulent advertising was obtained in May, 1977, enjoining another of petitioner's companies, Universal Marketing Corporation, which largely took over Diversified's activities after Diversified filed for bankruptcy.

Petitioner was indicted by a federal grand jury in April, 1981, charged with sixteen counts of mail fraud and one count of wire fraud; a superseding indictment, alleging virtually identical facts, was returned in June, 1981. Following a seven-day jury trial, petitioner was convicted on each of the eight mail fraud counts finally submitted to the jury. The petitioner was represented by attorneys Judd J. Carhart and James W. Lawson throughout the proceedings.

The prosecution's case consisted of the testimony of victims who invested in distributorships and then lost their money.

The assistant Massachusetts Attorney General, William Green, who investigated petitioner and obtained the preliminary injunctions, emphasized that while negotiating the injunction's language, he asked petitioner to produce satisfied customers to support his claim that distributors could earn handsome profits, but petitioner never did. The only defense witnesses were petitioner and his co-defendant who testified that they never intended to mislead or defraud anybody, that they attempted to satisfy all their customers' needs, and that they did not make any misrepresentations and tried to ensure that their agents made none.

Petitioner was sentenced on February 1, 1982. He received concurrent three-year sentences on counts 2, 3, 5 and 8; on counts 12, 13, 14 and 15 he received concurrent three-year sentences which were suspended, and a three-year period of probation, all to begin upon his release from confinement. Petitioner was also fined $1000 on each count, for a total fine of $8000.

Petitioner, who was represented by new appellate counsel, appealed his conviction arguing that the trial judge erred in failing to direct a verdict of acquittal and erroneously instructed the jury on a number of points. The First Circuit affirmed the convictions on all counts, except for count 15, in an unpublished opinion in April, 1983. *United States v. Porcaro*, 714 F.2d 109 (1st Cir.1983). After summarizing the evidence presented by the prosecution, the court concluded that a verdict of acquittal was unwarranted because "the record is replete with testimonies that loudly trumpet the fraud that is evident." *Id.*, slip op. at 8.

Petitioner's conviction on count 15 was reversed, however, because the court found that the mailing—a letter sent by P.R. Mallory & Co., manufacturers of Duracell batteries, to petitioner demanding that he cease representing himself and his company as authorized distributors—was not sent for the purpose of executing the scheme to defraud, an essential element of a convic-

tion under 18 U.S.C. § 1341. *Id.*, slip op. at 9.

Reviewing the trial court's jury instructions for plain error, the First Circuit found none, concluding that the instructions on good faith, reasonable doubt, criminal intent and advice of counsel were all proper as given.

Petitioner began serving his three-year prison sentence in May, 1983. Paroled in October, 1984, after seventeen months of incarceration, petitioner's probationary period began when he was released and will end in October, 1987.

## II.

### A.

In September, 1983, soon after he began serving his sentence, petitioner filed this *pro se* petition for a writ of habeas corpus. He alleged five grounds in support of his petition. They are: (1) that there was an improper variance between the indictment, the proof presented at trial and the charge; (2) that the mail fraud statute under which he was convicted was unconstitutional; (3) that he received ineffective assistance of counsel; (4) that he was indicted by an unconstitutionally-selected grand jury which excluded professionals and blacks; and (5) that the government knowingly presented perjured testimony to the grand jury.

Petitioner's ground 3, that he received ineffective assistance of counsel, is made up of eight specific attacks on the manner in which his counsel prepared and presented his defense. Part 1 claims that petitioner told his counsel of many potential defense witnesses, including eleven satisfied customers, who would have given helpful testimony, but that counsel refused to speak to them before trial and did not call them as witnesses. In part 2, petitioner says that counsel failed to object to the trial judge's jury instructions which petitioner says improperly shifted the burden of proof on intent to him. Part 3 asserts that counsel did not object to the trial judge's allegedly improper and prejudicial

mannerisms and remarks. Part 4 asserts that counsel did not realize that count 13 was barred by the five-year mail fraud statute of limitations. In parts 5 and 6, petitioner complains of the closing arguments: he alleges that his counsel's argument was deficient, and he contends that counsel should have objected to factual inaccuracies in the prosecution's closing argument. Part 7 claims that counsel failed to object to the trial judge's effort to coerce a guilty plea; through his law clerk, petitioner says, the trial judge promised him a one-year sentence if he pleaded guilty, but a three-year sentence if he was convicted following trial. Finally, in part 8, petitioner complains that counsel did not object to the sentencing court's failure to read the government's version of the offense in the presentence report.

### B.

Without holding an evidentiary hearing, the trial judge dismissed the petition in August, 1984. *Porcaro v. United States*, 588 F.Supp. 1366 (D.Mass.1984). Petitioner appealed. Holding that the petition was properly dismissed without a hearing, with the exception of three claims, the First Circuit affirmed in part, reversed in part and remanded. *Porcaro v. United States*, 784 F.2d 38 (1st Cir.1986) (per curiam). Those three claims, all part of petitioner's claim of ineffective assistance of counsel, are now before this Court on remand. To put this matter in perspective, I set out in some detail the First Circuit's reasoning, conclusions and instructions on how to proceed on remand.

To begin, the court was not persuaded by four of the five arguments advanced in petitioner's section 2255 petition—grounds 1, 2, 4 and 5. The indictment was not impermissibly amended to conform to the proof presented at trial, as petitioner claimed in ground 1. Several mailings were sent to petitioner by customers and others. But the superseding indictment charged that petitioner "did place and caused to be placed" certain matter in the mail, not that petitioner himself mailed

fraudulent material. The trial judge, thus, properly told the jury that petitioner need not have knowingly used the mails, only that he must have performed certain acts under circumstances where it was reasonably foreseeable that the mails would be used. *Id.* at 39–40.

The court rejected the argument advanced in ground 2 that Congress exceeded its constitutional authority when it enacted the mail fraud statute under which petitioner was convicted. Congress has plenary authority to regulate the mails. *Id.* at 40.

The court was also unpersuaded by ground 4, petitioner's claim that he was indicted by an unconstitutionally-selected grand jury. Petitioner failed to raise this objection before trial as required by the Federal Rules of Criminal Procedure. Fed. R.Crim.P. 12(b)(2). And trial counsel's decision not to challenge the grand jury's composition could not amount to ineffective assistance of counsel which might excuse the procedural default. *Id.* at 43.

Ground 5 alleged that a federal postal inspector who investigated petitioner gave perjured testimony before the grand jury. The court found that the postal inspector's initial testimony was inaccurate, but that it was later corrected and a superseding indictment returned. *Id.*

### C.

I turn now to the First Circuit's discussion of ground 3 of petitioner's habeas corpus petition which alleges that he received ineffective assistance of counsel.

As noted earlier, this claim involves eight discrete allegations which the court treated *seriatim.* As to five of these claims— parts 2, 4, 5, 6 and 8—the court ruled that the section 2255 petition was properly dismissed without a hearing. The court affirmed the district court's determination that petitioner failed to state an ineffective assistance of counsel claim on the ground that counsel failed to object to the jury charge (ground 3, part 2); that counsel failed to notice that count 13 was barred by the statute of limitations (ground 3, part 4); that counsel failed to object to the prosecu-

tion's closing argument (ground 3, part 5); that counsel's closing argument was deficient (ground 3, part 6); and that counsel failed to object to the sentencing court not having read a portion of the presentence report (ground 3, part 8).

However, on three claims—parts 1, 3 and 7—the court reversed the district court's summary dismissal of the section 2255 petition. Taking petitioner's allegations as true, except to the extent they were contradicted by the record, inherently incredible, or conclusions rather than statements of fact, *id.* at 40, the First Circuit concluded that as to those three specific claims of ineffective assistance of counsel, petitioner made sufficient factual allegations to state a claim on which habeas corpus relief could be granted. These claims were remanded to this Court to consider, initially, whether an evidentiary hearing was warranted, and then to conduct any further proceedings.

Ground 3, part 1, supplemented by petitioner's accompanying affidavit, alleges that petitioner told counsel of satisfied customers who would have testified that petitioner made no misrepresentations, fulfilled all his promises, and honored the buy-back provision when asked to do so. The First Circuit noted that counsel's decision not to call satisfied customers might have been "rational trial tactics," *id.* at 41, but it was unable to conclude at this early preliminary pleading stage that such testimony would not have improved petitioner's chances for acquittal and so could not say that petitioner had failed to state a claim.

Petitioner's affidavit also alleges that counsel failed to contact or call at trial other potentially helpful witnesses, including an assistant Massachusetts attorney general who investigated petitioner, federal bankruptcy court officials, salespersons and locators who worked for petitioner, and officers of several companies whose products petitioner's distributors sold. The First Circuit did not, however, consider this evidence, leaving it to this Court on remand. *Id.* at 41 n. 2.

Petitioner claims in ground 3, part 3, as supplemented by his earlier motion to recuse the trial judge from passing on his section 2255 petition, that his counsel failed to object to the trial judge's improper and prejudicial gestures and facial expressions which suggested to the jury that he disbelieved defense witnesses and believed the prosecution's witnesses. Taking the uncontradicted allegations as true, the First Circuit concluded that "[i]f such pervasive nonverbal communication took place, counsel should have objected and called the matter to the judge's attention." *Id.* at 41–42. Thus, the district court should not have summarily dismissed this portion of the section 2255 petition.

In ground 3, part 7, petitioner alleges that the trial judge, acting through his law clerk, made a plea offer, promising petitioner a one-year sentence for a guilty plea, but a three-year sentence if petitioner was convicted after pleading not guilty and standing trial. Petitioner's allegations were uncontradicted. The First Circuit concluded that the plea offer, if it occurred, would have violated Rule 11 of the Federal Rules of Criminal Procedure and could give "rise to an appearance of vindictive sentencing." *Id.* at 42. Thus, the court remanded the issue so the claim could "receive further attention on remand." *Id.*

Because of the nature of petitioner's allegations, the First Circuit felt it better that remand proceedings be held before another judge. The court carefully noted that petitioner was not necessarily entitled to an evidentiary hearing on remand. *Id.* at 41. It suggested that "the more expeditious course" would be, first, to require petitioner to obtain affidavits from the allegedly satisfied customers and other uncalled witnesses, as well as witnesses to the events alleged in parts 3 (failure to object to judicial mannerisms) and 7 (failure to object to court effort to coerce a guilty plea). *Id.* If these submissions showed that petitioner's facially adequate allegations deserved a full airing, this Court could then conduct an evidentiary hearing.

On April 1, 1986, the First Circuit denied petitioner's motion for a rehearing of a portion of its opinion. *Porcaro v. United States*, 789 F.2d 73 (1st Cir.1986). Petitioner sought a rehearing on the argument raised in ground 3, part 4 of his section 2255 petition, that is, that he received ineffective assistance of counsel because counsel failed to move to dismiss count 13 which was barred by the statute of limitations.

Count 13 concerned an October, 1976 letter to petitioner mailed by one of his customers asking petitioner to repurchase his unsold inventory of cigarette lighters pursuant to petitioner's buy-back agreement. The court first reaffirmed its earlier conclusion that the letter was mailed within five years of the date petitioner was indicted and thus count 13 was not barred by the five-year statute of limitations. 18 U.S.C. § 3282. Next, the court explained that a letter sent by an alleged victim of the distributorship fraud could further petitioner's fraudulent scheme and serve as a predicate for a mail fraud count. The buy-back offer was a "prime feature of the distributorship contracts." *Id.*, 789 F.2d at 74. Petitioner might have felt obligated to honor the repurchase part of the distributorship agreement to forestall complaints. Thus, the letter was "sufficiently closely related to petitioner's scheme to support the mail fraud count." *Id.*, at 74.

### III.

Following the First Circuit's remand order, this Court held a hearing on April 30, 1986. In keeping with the First Circuit's instructions, this was not an evidentiary hearing, but rather one to determine how to proceed and to set a schedule. Petitioner appeared *pro se* but was told by the Court that counsel would be appointed if petitioner satisfied the Court that he was unable to afford counsel. Petitioner was given a financial affidavit but a completed affidavit was never filed. Petitioner was told to file affidavits from the witnesses he says would have testified on his behalf and whose names he supplied to counsel before trial. He was also told to file affidavits

from persons who attended or participated in his trial corroborating his allegations that the trial judge behaved improperly and tried to coerce a guilty plea. The government was directed to supply petitioner with the names and addresses of courtroom personnel and counsel who were present during petitioner's trial. Petitioner was given six weeks, until June 13, 1986, to file these affidavits and any other submissions he felt appropriate or helpful.

On May 2, 1986, the government furnished petitioner with the names and addresses of persons present during his trial including the attorneys of record, the court reporter, the trial judge's courtroom clerk and the postal inspector.

In response to petitioner's request, the government furnished more information on May 28, 1986, including the names and addresses of persons listed in the indictment as victims of petitioner's fraudulent scheme, the names and addresses of victims not listed in the indictment who testified at petitioner's trial, and the names and addresses of the trial judge's law clerks at the time of petitioner's trial.

On June 13, 1986, this Court granted an extension, giving petitioner until July 7, 1986 in which to file affidavits and other submissions. Over a month has passed since petitioner's affidavits were due and over three months since the April hearing. The government furnished petitioner with names and addresses of persons pertinent to his allegations. Yet, petitioner has filed no affidavits or other submissions with this Court.

 Petitioner's inaction alone warrants dismissal of the remaining claims raised in his section 2255 petition. This is no longer a preliminary pleading stage; my inquiry goes further than whether petitioner has made sufficient factual allegations which, if true, would state a claim on which relief could be granted. *See United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). That stage is passed. In reversing the summary dismissal of petitioner's petition, the First Circuit

held only that petitioner had made factual allegations which, if true, stated a claim that he did not receive effective assistance of counsel. But the court was equally clear that simply having stated a claim "does not necessarily mean that on remand petitioner will be entitled to an evidentiary hearing." *Porcaro*, 784 F.2d at 41. That petitioner's claims, if true, would entitle him to habeas corpus relief does not make them true or credible. The First Circuit did not endorse petitioner's claims but held only that he should have an opportunity to prove them. Petitioner has been given that opportunity and has ignored it.

Following the procedure outlined in *Blackledge v. Allison*, 431 U.S. 63, 80–83, 97 S.Ct. 1621, 1632–34, 52 L.Ed.2d 136 (1977), this Court instructed petitioner to obtain affidavits from the uncalled witnesses whose testimony he says could have helped his defense and from witnesses who could corroborate his allegations of the trial judge's improper mannerisms and effort to coerce a guilty plea. *See* Rule 7 of the Rules Governing Section 2255 Proceedings in the United States District Courts (judge can direct expansion of the record to include any appropriate materials that enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing); *Walters v. Harris*, 460 F.2d 988, 992 (4th Cir.1972); *Kent v. United States*, 423 F.2d 1050, 1051 (5th Cir.1970).

Petitioner, however, has submitted nothing. He has not even supplemented the affidavit he filed with his section 2255 petition. Petitioner ignored this Court's direction to expand the record in order to show that his facially adequate allegations have sufficient basis in fact to warrant plenary presentation of evidence. *See Blackledge v. Allison*, 431 U.S. at 80, 97 S.Ct. at 1632. Petitioner appears *pro se.* It is apparent, however, from petitioner's exchange of letters with the United States Attorney's office in May, after the April hearing, that petitioner understood his obligation. Petitioner asked for, and received,

more time in which to compile affidavits or other submissions. Petitioner is not in custody. He had ample time in which to obtain at least some of the affidavits. I must conclude that petitioner's failure to file affidavits or any other submissions was deliberate not inadvertent.

## IV.

The government has, moreover, submitted affidavits of a number of persons including the trial attorneys and courtroom personnel; these affidavits entirely contradict petitioner's allegations. The seriousness of petitioner's claims—he accuses his lawyers of incompetence and dereliction, and the trial judge of bias and judicial impropriety—requires me to spend some time outlining these affidavits. Petitioner's three claims of ineffective assistance of counsel will be treated separately.

### A. Counsel's Failure to Present Favorable Evidence.

#### 1.

Petitioner's section 2255 petition alleges that his lawyers, Carhart and Lawson, "failed to conduct an independent and thorough investigation" and made no effort "to call relevant witnesses ... critical to a fair presentation of the Petitioner's case." In an accompanying affidavit, petitioner alleges that although he furnished counsel with names of potentially helpful witnesses, including satisfied customers, counsel did not speak with them before trial and did not call them as witnesses. Petitioner says he "pleaded" with counsel to call these witnesses.

Carhart, petitioner's lead counsel, has filed a lengthy and detailed affidavit contesting petitioner's claims. Lawson, who assisted Carhart, has also filed an affidavit which is less detailed than Carhart's but which fully corroborates Carhart's unsuccessful efforts to find even a single satisfied customer. Each witness will be considered individually, listed according to the numbering system in petitioner's affidavit.

### 1A(1)(a) Stephen Fauteux

Fauteux, according to petitioner, was an assistant Massachusetts attorney general who investigated petitioner. Petitioner says that if called Fauteux would have testified that petitioner's business was not fraudulent, that he signed a release protecting petitioner from any claims stemming from his distributorship business, and that the Commonwealth's investigation was an over-reaction instigated by Assistant Attorney General William Green. Petitioner says he gave Fauteux's telephone number to counsel, but counsel "neglected to contact him."

Carhart's affidavit states that petitioner told him about Fauteux and that counsel unsuccessfully attempted to contact Fauteux at the telephone number supplied by petitioner. Counsel states, however, that petitioner agreed during a lengthy and detailed discussion of the defense that Fauteux should not be called. Moreover, former Assistant Attorney General Green testified and was extensively cross-examined by petitioner's counsel and by counsel for his co-defendant. These questions fully explored Green's relative inexperience in the Attorney General's Consumer Protection Division, and the narrowly-worded injunctions which barred petitioner from false advertising, but did not enjoin him from selling distributorships. Counsel's closing argument returned to these themes.

Without an affidavit from Fauteux stating, first, that he would have testified at all, and, second, that he would have given testimony different from Green's, I cannot say that counsel's decision not to call Fauteux was incorrect or even unwise, particularly since petitioner agreed with the decision at the time.

### 1A(1)(b) H. Drew Romanovitz

Petitioner asserts that counsel "failed to make any effort" to locate Romanovitz, a covert investigator working for the Massachusetts Attorney General. Romanovitz, petitioner says, would have testified that he posed as a prospective purchaser and that petitioner made no misrepresentations in his sales pitch.

Carhart's affidavit includes several reports prepared by a private investigation company, Investigo Corporation (Investigo), hired by counsel to help prepare petitioner's defense. A September 30, 1981 Investigo report states that an investigator interviewed Romanovitz, a Salem attorney, on September 14, 1981. Romanovitz stated that he had worked with William Green in the Massachusetts Attorney General's office investigating several distributorship cases but did not recall any specifics about Porcaro and said he "did not even recognize the name 'Porcaro.'"

### 1A(1)(c) Bankruptcy Witnesses

Petitioner contends that counsel "failed to obtain" the testimony of Henry Freedman and the Hon. Thomas W. Lawless who he says would have testified that in the bankruptcy proceedings involving petitioner's company, Diversified, "no claim of fraud had been substantiated." Freedman is not identified by petitioner; Lawless is a federal bankruptcy judge who apparently presided over the Diversified bankruptcy proceeding. He also says counsel failed to obtain testimony from the bankruptcy trustee, Richard Kagan, who would have testified that "after conducting a thorough investigation" he found no evidence that petitioner was conducting a fraudulent scheme.

Carhart states that petitioner never asked him to speak to Freedman or Lawless or to call them as defense witnesses.

Carhart says he did speak to Kagan, who told him he would be a "much better prosecution witness" and that he had concluded it was "impossible for a profit to be made" by a person who purchased one of petitioner's distributorships.

The jury learned of the Diversified bankruptcy. Assistant Attorney General Green testified about the Diversified bankruptcy proceedings and, under cross-examination by counsel, admitted that some claims filed by distributors were denied.

### 1A(1)(d) Satisfied Customers

Petitioner alleges that counsel "failed to call" seven satisfied customers who would have testified that petitioner made no misrepresentations, fulfilled all his promises, and used no high-pressure sales tactics. It is unclear from petitioner's affidavit whether he alleges that counsel failed to speak to these potential witnesses and did not make a diligent effort to do so, or whether petitioner disagrees with counsel's decision, made after reviewing their possible testimony, not to call them as defense witnesses.

Carhart's affidavit treats each of these witnesses separately.

### Alan Ramsdell

Ramsdell was interviewed during the trial after counsel subpoenaed him. According to counsel, Ramsdell "had nothing good to say" about petitioner and, in any event, would not have been able to withstand rigorous cross-examination.

Ramsdell was interviewed by the FBI in October, 1978; in May, 1986, the government furnished petitioner with a summary of this interview. Ramsdell told the FBI that he bought a distributorship from petitioner who "never misrepresented himself and never promised them anything."

An investigator from Investigo interviewed Ramsdell in the fall of 1981. Ramsdell said he had "never had any problems" with petitioner and would speak in his behalf but did not wish to travel to Massachusetts.

Counsel also subpoenaed Francis Romano, a friend of Ramsdell and a fellow-schoolteacher; Romano and Ramsdell invested together in a Duracell battery distributorship. Romano, according to Carhart, had nothing helpful to say about petitioner. And counsel says petitioner, when told about Romano's potential testimony, agreed with counsel's decision not to call him.

### Joseph Chabot

An Investigo investigator spoke to Chabot's wife; she said that she and her husband lost money on the battery distributorship they bought from petitioner and had "nothing good" to say about petitioner. Counsel followed this with a telephone call;

Chabot said he was unwilling to testify and that his distributorship was a "bad deal" which he should not have pursued.

### Charles E. Saimond

Counsel states that he and petitioner discussed Saimond's testimony before trial and both agreed not to call him; this decision was re-affirmed at a final pre-trial meeting in December, 1981.

### Robert Miller

Counsel states that petitioner never told him about Miller. According to counsel, every name of a potential witness supplied by petitioner was given to Investigo. Miller's name does not appear in the Investigo reports submitted along with Carhart's affidavit.

### Arden Black

Counsel states that petitioner never gave him this name as a potentially helpful defense witness.

### Robert Latham

Counsel states that petitioner never gave him this name as a potentially helpful defense witness.

### Harold Hixon

Counsel states that petitioner never gave him this name as a potentially helpful defense witness.

In June, 1980, a Harold Hixson was interviewed by Kevin McDonough, a federal postal inspector investigating petitioner. A copy of McDonough's memorandum of this interview was turned over to petitioner in May, 1986.

Hixson told McDonough that he attended a sales meeting in Ohio conducted by a company called Midland Corporation after seeing a newspaper advertisement placed by Universal Marketing. He said he did not believe the sales pitch's claims about potential earnings or the buy-back guarantee. Hixson said he did not expect to earn much from his investment, hoping only to make enough to cover the expenses of another distributorship. Nonetheless, within four months of investing Hixson was "dissatisfied." McDonough concluded that Hixson was uncooperative and reluctant to answer his questions.

### 1A(1)(e) Satisfied Customers: Cash Refunds

Petitioner asserted that counsel failed to call four customers who, he says, would have testified that they had purchased distributorships, asked for refunds and received them. They were: Margaret Dean; Mel Ericksen; Harold Wilder; and Joseph Gara.

Carhart states in his affidavit that petitioner never suggested these four names to him as potentially helpful defense witnesses.

### 1A(1)(f) Salespersons

Petitioner's affidavit contends that petitioner "pleaded with" counsel to call six salespersons who worked for him promoting distributorships. If called, petitioner asserts, these six would have testified that petitioner told them not to make misrepresentations to potential customers.

### M.C. Lack

Petitioner, according to counsel's affidavit and accompanying exhibits, asked Investigo to locate this potential witness and apparently supplied information to help find him. However, Investigo's August, 1981 report indicates that "numerous calls" to the telephone number petitioner provided were fruitless. Petitioner received a copy of this report before trial.

### Claude Mathis

Petitioner supplied Investigo with a Pittsburgh address and telephone number for Mathis. However, the August, 1981 Investigo report indicates that the telephone number was inaccurate and Pittsburgh directory assistance did not list a "Claude Mathis."

### Morgan Jones

Counsel did not speak with Jones. A June, 1981 Investigo report states that Jones had "no knowledge" of petitioner, though he had purchased a distributorship from a person who did business with someone in Massachusetts. Jones was trying to find the person who sold him his distribu-

torship because he felt he was owed money.

### Sal LoPriore

Petitioner supplied Investigo with a New York telephone number. Investigo's August, 1981 report states that the number was disconnected and directory assistance showed no listing for that name.

### Clay Lawrence

Petitioner supplied Investigo with a Pennsylvania address. The August, 1981 Investigo report indicates that Investigo had tried several times without success to locate Lawrence.

### Pat Petterson

Petitioner told Investigo that Petterson (counsel spells his name "Peterson") lived in Pittsburgh but was unable to supply an address or a telephone number. Investigo's August, 1981 report states that Investigo could not locate him without further information.

### Locators

Petitioner also asserted in his affidavit that counsel failed to call four "locators" who worked for him arranging for retail outlets to be supplied by distributors. Petitioner claims that these locators would have testified that they were told to find the "best locations" and not to mislead anyone. Locators would also have testified that they told customers to read each document the customers were asked to sign including the allegedly deceptive "locator summary receipt" which was, in fact, a release, by which distributors absolved petitioner's companies from any legal liability.

### Robert Kaff

Petitioner supplied Investigo with a telephone number. Investigo's July, 1981 report indicates that the number was no longer in Kaff's name.

### Richard Garner

Counsel's affidavit spells his name "Carner." The June, 1981 Investigo report indicates that Carner was interviewed by Investigo. Carner insisted that "all he did was perform the locating function" for petitioner in Florida and that he had "no business dealings with a distributor at all." Counsel's affidavit states that he spoke at length with petitioner about Carner's potential testimony. Counsel felt Carner was defensive and would not be a helpful defense witness.

### Raymond Morin

Counsel spoke to Morin by telephone at length before trial. Counsel concluded that Morin did not have information that would show that petitioner's business was not fraudulent, and would not be a useful witness.

### Anthony Porcaro

Counsel spoke by telephone to petitioner's brother who lives in California. He showed "no interest in coming to Massachusetts to testify" and offered nothing to show that his brother's business was not fraudulent.

### 1A(1)(g) References

Petitioner stated in his affidavit that counsel failed to call two witnesses listed by petitioner as references—a Mr. Thompson at Shawmut Community Bank and David Arvedon—who would have testified that they were not asked to supply a false reference on petitioner's behalf. According to petitioner, David Arvedon would also have testified that he shipped goods to petitioner in good condition.

### Mr. Thompson of Shawmut Community Bank

Counsel's affidavit states that he had a discussion about petitioner's bank records, though he does not say whether this discussion was with petitioner or with Thompson. Testimony about petitioner's bank records, counsel concluded, would have hurt not helped petitioner's defense.

### David Arvedon

Counsel states that several times he tried to speak to Arvedon by telephone but Arvedon did not return his calls.

Counsel states further that after discussion, both he and petitioner concluded that Arvedon's possible testimony about shipping goods would confuse the jury and not help petitioner's defense.

### 1A(1)(h) Manufacturers

Petitioner's affidavit asserts that counsel failed to call Scripto, Inc. and Panasonic officials who would have testified that they had "advance knowledge" that petitioner was claiming to be an authorized distributor for their products.

### Phil Unger, Scripto, Inc.

Counsel's affidavit states that petitioner never mentioned Unger's name as a potential defense witness. However, counsel says he did discuss with petitioner whether Panasonic and Scripto had permitted him to represent himself as authorized to sell distributorships for their products; these companies had not given petitioner permission, and he and counsel decided such testimony would have been "counterproductive."

I also note that Frederick Ashley, Scripto's risk/credit management manager was called at petitioner's trial. He testified that petitioner's company, Diversified, bought Scripto products as an ordinary wholesaler but was not authorized to sell distributorships or franchises for Scripto's products.

### Joseph Barbagello, Panasonic

Counsel states in his affidavit that he tried several times to reach Barbagello and each time left his name and telephone number. Barbagello, however, did not return the calls.

### 2.

■ It is difficult to determine from petitioner's section 2255 petition and his accompanying affidavit exactly what he is alleging. In some instances it appears he is claiming that he told his counsel about potentially helpful witnesses but counsel then improperly chose not to call them even though he knew they would testify favorably. Counsel's reason, petitioner says, was his "desire to minimize the trial time and avoid what he characterized as 'wasting the Court's time.'" Elsewhere petitioner apparently claims that counsel did not bother even to locate and speak to potentially helpful witnesses. Having carefully reviewed counsel's affidavit, relevant portions of the trial transcript and other information, I must, nevertheless, conclude that petitioner's broad and uncorroborated allegations have been thoroughly refuted and there is no need to explore them further; an evidentiary hearing would be pointless.

■ Many of these purportedly helpful defense witnesses could not be found, not for counsel's lack of effort but because petitioner never supplied him with their names, or gave counsel and his investigator such scanty and stale information about their whereabouts that they could not be found. Other potential witnesses knew nothing about petitioner and his companies. Still others, such as Richard Kagan, the bankruptcy trustee who was convinced no distributor could make a profit by investing in petitioner's scheme, would have given testimony damaging to petitioner's defense. And others, such as former Assistant Attorney General Fauteux and Francis Romano, who arguably might have given helpful testimony, might also have damaged petitioner's defense and would have been vulnerable on cross-examination; petitioner, after consulting with counsel, agreed not to call them.

Reading the trial transcript and counsel's affidavit, it is clear that counsel's preparation and presentation of petitioner's defense did not fall below an objective standard of reasonableness. *See Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). In fact, counsel's efforts were well above that standard. In particular, I find that counsel's preparation in which petitioner was actively involved, was more than adequate. Counsel followed whatever leads petitioner suggested; petitioner gave names of supposedly helpful witnesses directly to the private investigators. Counsel spoke to each witness he could find. Of those he located and spoke to, only three could have given even minimally helpful testimony—Ramsdell, Hixson, and Carner. I cannot say that counsel's decision not to call these witnesses amounts to ineffective assistance of counsel.

A trial lawyer must calculate the marginal utility of each witness, estimating the value of the witness' testimony but taking into account how the witness will fare on cross-examination. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Possible confusion, contradiction by other witnesses and a host of other considerations must also be weighed. These judgments are difficult to make and even more difficult to evaluate and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* In reviewing trial counsel's investigation and preparation, a court cannot indulge hindsight but must try to judge counsel's decisions in the context in which they were made. That a client disagrees with counsel's tactical decisions at the time or later does not mean those decisions are wrong or incompetent.

Here, Ramsdell, a supposedly satisfied customer, was prepared to give what counsel believed was, at best, equivocal testimony. He did not willingly step forward but spoke to counsel in response to a subpoena. Ramsdell did not tell the FBI that he was satisfied, or that he had made handsome profits distributing. Duracell batteries; he said merely that petitioner never misrepresented himself and never promised anything. He told counsel's investigator only that he never had any problems with petitioner. Counsel decided, based on interviewing him, that Ramsdell would add little to petitioner's defense and could be undone by rigorous cross-examination. Moreover, Ramsdell's co-investor, Francis Romano, according to counsel, had nothing good to say about petitioner and petitioner agreed with counsel's decision not to call Romano as a witness.

Counsel says he never heard of Harold Hixson, another allegedly satisfied customer. There is nothing to support petitioner's allegation that counsel did know about Hixson and his testimony. If the Hixson interviewed by the postal inspector in Ohio is the same as the "Hixon" about whom petitioner says he told counsel, there ought to be an Investigo report which mentions his name. There is none. Hixson lived in Ohio; every other out-of-state witness, and a good many in-state witnesses, were first contacted and interviewed by Investigo.

In any event, it is plain from the postal inspector's memorandum of his interview that Hixson would not have offered helpful testimony. First, he never dealt with petitioner and did not appear to know his name. Second, he was a "satisfied" customer only because he was skeptical of the exaggerated claims made in the promotional literature and at the sales meeting. Hixson did not believe the charts purporting to show the profits distributors could make; he did not believe that Universal would buy back all of his unsold inventory and refund his money after one year if he was unhappy. Hixson expected nothing, or next to nothing, from the distributorship he purchased and he was not disappointed. That hardly makes him a satisfied customer whose testimony would have overcome the testimony of fourteen disgruntled victims of petitioner's scheme.

Finally, there is Richard Carner, petitioner's Florida locator. Counsel spoke to Carner and concluded he was too defensive to be a helpful witness. This is supported by Carner's statements to the Investigo investigator that he only found locations and had nothing to do with distributors. He did not say, as petitioner claims he would have at trial, that petitioner told him not to mislead distributors and to insist distributors read and understand all documents before signing. Moreover, counsel states that petitioner agreed with counsel's assessment of Carner's testimony and concurred in the decision not to call him.

Without affidavits from these witnesses to the contrary, there is no reason counsel's statements should be doubted. Counsel's affidavit is detailed and specific, and is corroborated, at least generally, by the affidavit of his co-counsel, Lawson. To be sure, counsel is defending and explaining his own behavior. Petitioner's unsubstantiated allegations, however, cannot create a credibility issue by their own force. Accordingly, I must conclude that petitioner has not persuaded me on remand that his

allegations that counsel ineffectively prepared his defense warrant an evidentiary hearing.

### B. *Counsel's Failure to Object to Trial Judge's Mannerisms*

In ground 3, part 3 of his section 2255 petition, petitioner contends he was denied effective assistance of counsel in that counsel did not object to the trial judge's "unfair and prejudicial remarks mannerisms and intonations." The First Circuit relied on petitioner's motion to recuse the trial judge from passing on his section 2255 petition for additional facts. In that motion, petitioner alleged that during trial the trial judge "would look at the jury and make faces, shake his head in disbelief, look at the ceiling ... use obvious jesters [sic] and mannerisms whenever defense witnesses testified conveying the impression to the jury that the defense witness should not be believed." Noting that the allegations were uncontradicted, the court concluded that "if such pervasive nonverbal communication took place, counsel should have objected and called the matter to the judge's attention." *Porcaro,* 784 F.2d at 41–42.

At the April, 1986 hearing following the First Circuit's remand order, petitioner was told he would have to file affidavits from some persons who attended his trial who could corroborate his allegations. The government provided petitioner with the names and addresses of the lawyers, the agent-in-charge, Postal Inspector McDonough, the trial judge's courtroom clerk, the court reporter and the trial judge's law clerks. As noted above, petitioner has not filed affidavits from any of these persons, or from anybody else, supporting his allegations. Petitioner has not even expanded on his own allegations filed before the First Circuit decision on the dismissal of his section 2255 petition earlier this year. Thus, this Court has only what it started with, the petitioner's general and unsupported allegations.

Against that, the Court has received affidavits from petitioner's trial counsel, Judd J. Carhart and James W. Lawson, the trial judge's courtroom clerk, Joan S. Epler, the postal inspector who sat at the prosecution's table throughout the trial, the assistant United States attorney who prosecuted petitioner, Joan C. Stanley, and one of the trial judge's law clerks who observed a good deal of petitioner's trial, Kathleen L. Ferrell. Each affiant insists under penalty of perjury that the trial judge did not behave as petitioner says he did.

Petitioner was given the names and addresses of each of these affiants. He could easily have taken their affidavits. Petitioner has not suggested any other witness who observed his trial who might corroborate his allegations. From this record, this Court can only conclude that an evidentiary hearing on this claim would simply pit petitioner's general allegations against every other witness' denial. Petitioner has not bothered to supplement his petition and motion to recuse; he has not given the Court specific and detailed charges such as which government witnesses the trial judge, through his gestures, told the jury to believe and which defense witnesses were unworthy of belief. While this issue might arguably have become a matter of credibility, had petitioner heeded this Courts instructions, *Raines v. United States,* 423 F.2d 526, 530 (4th Cir.1970), I am unwilling to squander the time and expense on an evidentiary hearing which promises to be nothing more than a chorus of uncontradicted witnesses reciting their affidavits. This is not a matter of how many affidavits each side has produced. Petitioner, however, has failed to persuade this Court that it must decide a genuine issue of fact that turns on my assessment of credibility. Petitioner's refusal to comply with this Court's order that he file affidavits supporting his claim forecloses that issue. There are not two plausible versions of fact; petitioner advances only unsubstantiated claims, not supported by the affidavit of a single witness or even his own expanded recollection. I need not decide whom I believe. Petitioner's claims do not merit that consideration. Petitioner has known since at least April 30, 1986 that

he needed to supply this Court with something more than his previously-filed pleadings on this question. He has not responded, except to ask for even more time.

Having carefully reviewed petitioner's allegations and the affidavits of what would appear to be every material witness to petitioner's trial, I must conclude that petitioner is not entitled to an evidentiary hearing on this claim. Accordingly, this portion of his section 2255 petition, ground 3, part 3, is dismissed.

### C. *Counsel's Failure to Object to Trial Judge's Effort to Coerce a Guilty Plea*

Petitioner contends that he was denied effective assistance of counsel in that counsel tolerated, without comment, improper efforts by the trial judge to coerce petitioner to plead guilty before trial. While petitioner's section 2255 petition does not set forth many details, his motion to recuse the trial judge from passing on his section 2255 petition does, and the First Circuit considered the allegations in that motion as if incorporated by reference into the section 2255 petition.

In his motion for recusal, petitioner alleged that

"The Trial Judge, through his law clerk, indicated that in exchange for a guilty plea, the sentence would be one year. The Court later, after trial, sentenced the Petitioner to a three year term. This is clearly additional punishment deliberately inflicted for the purpose of denying Petitioner his right to a trial by jury."

Such a plea offer, if it was made, would have violated Fed.R.Crim.P. 11(e)(1) which bars the court's participation in plea discussions. *Porcaro*, 784 F.2d at 42. And the trial judge's making good on his warning could "give rise to an appearance of vindictive sentencing." *Id.*

The issue on remand is simple: did the trial judge, acting through his clerk, attempt to coerce a guilty plea before trial and, if he did, did petitioner's counsel know, but fail to object. Petitioner was told at the April, 1986 hearing to obtain affidavits from his counsel and from the clerk who conveyed the trial judge's alleged plea offer. Although petitioner in his petition described this person as the trial judge's law clerk, he apparently now says that she was the trial judge's courtroom clerk, Joan S. Epler.

The government, in May, 1986, furnished petitioner with the names and addresses of all three of the trial judge's then-law clerks and of his courtroom clerk. Petitioner has not filed a single affidavit with this Court. Nor has he submitted anything else to this Court to substantiate his claim. He has not, for example, filed a supplemental affidavit of his own, providing detailed and specific factual allegations which might give his claim some substance and plausibility.

The government has filed affidavits from the trial judge's then-courtroom clerk, Joan S. Epler, and one of his law clerks, Kathleen L. Ferrell, who observed much of petitioner's trial. Both affidavits are unequivocal: neither Epler nor Ferrell discussed "possible sentences with Peter Porcaro or his counsel, or [told] Peter Porcaro or his counsel that in exchange for a guilty plea he would be sentenced to a term of one year." Affidavit of Joan S. Epler, ¶ 7; Affidavit of Kathleen L. Ferrell, ¶ 9, and neither saw anyone else make such an offer to petitioner. The Court also has affidavits from petitioner's trial counsel and each directly refutes petitioner's allegations. Lawson, for instance, states in his affidavit that the trial judge's law clerk and courtroom clerk never indicated "through express or implied language that the [trial judge] would sentence defendant Porcaro to imprisonment for one year in exchange for his change of plea." Affidavit of James W. Lawson, ¶ 5. *See* Affidavit of Judd J. Carhart, ¶ 9.

It is true that petitioner's allegations relate to a purported occurrence outside the courtroom and upon which the record casts no light. Moreover, petitioner accuses the trial judge and one of his clerks of improper behavior, and his lawyers of incom-

petence or neglect; considerations of loyalty and self-interest arguably might intrude on their accounts of what transpired at petitioner's trial. But the same, of course, is true of the petitioner. Although this issue is largely a matter of credibility, the narrow issue before me today is whether petitioner is entitled to an evidentiary hearing. Petitioner was in a position to furnish this Court with specific factual allegations such as exactly when, where, and by whom the alleged plea offer was made. He was given ample opportunity to do so. His exchange of letters with the United States Attorney's office in May, following the April hearing, shows that petitioner, despite proceeding *pro se*, understood his obligation to submit some sort of corroboration or detailed allegations to this Court.

█ I must conclude that where petitioner has not made specific factual allegations, or provided substantiation, and where the government has filed counter affidavits from each of the persons who might possibly have witnessed the purported plea offer, that no evidentiary hearing is required. As I explained earlier, the preliminary pleading stage where petitioner need only make allegations that, if proved, would entitle him to habeas corpus relief is passed. This proceeding is now analogous to a summary judgment. Having made facially adequate allegations, the question now is whether petitioner's allegations have a sufficient basis in fact to warrant plenary presentation of evidence. *Blackledge v. Allison*, 431 U.S. at 63, 97 S.Ct. at 1621. The issue is not one of credibility, of whether I believe petitioner's version of the plea offer or the denials of the trial judge's courtroom personnel and the lawyers. Rather, the question before the Court is whether petitioner has gone beyond the bare allegations in his petition and made allegations sufficiently corroborated by other witnesses or by factual specificity as to warrant a full evidentiary hearing. Or,

in the summary judgment formulation, whether petitioner has shown that there is a genuine issue of material fact to be resolved. Petitioner was directed in April to furnish this Court with some proof that there is a genuine issue of fact to be resolved. Petitioner has not done so, nor has he added specific factual allegations to his general claim in place of affidavits from other participants or witnesses. He has not explained his inability to provide such proof.

Accordingly, I must conclude that the trial judge did not make the plea offer that petitioner alleges he made. Accordingly, petitioner's lawyers could not be expected to object, and petitioner was not denied the effective assistance of counsel.

*Summary*

In summary, petitioner has been given every opportunity to back up his claim that he received ineffective assistance of counsel in preparing and presenting his defense. He has been given a preliminary hearing at which a schedule was set, ample time to fulfill that schedule, the assistance of court-appointed counsel upon a proper request, and the names and addresses and access to every participant and possible witness to the occurrences of which he complains. Despite this, he has failed to present one jot of evidence to support his charges. He has unfairly accused an able and experienced trial judge, members of his staff, and two counsel who represented the petitioner vigorously, capably and conscientiously. I can only conclude that his charges are baseless and undeserving of further consideration.

In accordance with the above, on the claims remanded to this Court, I conclude the petitioner is not entitled to any relief and that no evidentiary hearing is required. These claims are to be dismissed.[1]

SO ORDERED.

---

1. On August 6, 1986, the petitioner filed a Motion for Postponement until 60 days after a decision is reached by the Supreme Court on petition for Writ of Certiorari of the judgment of the Court of Appeals entered February 21, 1986. The petition was filed on June 27, 1986, and is addressed to issues not related to the claims discussed herein. The motion was denied.